1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  TONI YOUNG, individually and on        No    C-02-4546 VRW
    behalf of all others similarly
12  situated,                                     ORDER

13          Plaintiffs,

14          v

15  POLO RETAIL, LLC, et al,

16          Defendants.
    _____/
17

18          As described in this court's preliminary approval order

19  of October 25, 2006 (Doc #149), the plaintiff in this class action,

20  Toni Young, has reached settlement with Polo Retail, LLC, Polo

21  Ralph Lauren Corp and Ralph Lauren Footwear, Inc.  In that order,

22  the court preliminarily approved the proposed settlement, certified

23  the settlement class pursuant to FRCP 23, preliminarily approved

24  the proposed plan of allocation, approved (subject to certain

25  modifications) a form of notice to be sent to class members and

26  preliminarily approved the plaintiff's application for an award of

27  attorney fees and expenses.  Notice having been disseminated to the

28  class under the terms of the court's order, see Doc #152, ¶ 9 and

**United States District Court**
For the Northern District of California

1  Ex 1, the parties now move for final approval of the proposed
2  settlement and the plan of allocation and plaintiff moves for final
3  approval of an award of attorney fees and expenses.  Doc #150.

4  The court held a final settlement approval hearing on
5  January 25, 2006.  For the reasons that follow, the court GRANTS
6  final approval of the proposed settlements, GRANTS final approval
7  of the plan of allocation and GRANTS an award of attorney fees and
8  expenses.  The court will discuss each of the above issues in turn.
9  Because the court's previous order addressed many of the issues
10 presented here for final approval, the court assumes familiarity
11 with the October 25, 2006, order and the definition of terms
12 therein.

13

14                                  I

15 It suffices at present to note that plaintiff filed on
16 October 1, 2002, a first amended complaint (FAC) in this diversity
17 case on behalf of herself and a class of current and former
18 employees of defendants' retail stores in California.  FAC at 3, ¶
19 7.  The FAC alleged that defendants violated several California
20 laws:  (1) the Cartwright Act, Cal Bus & Prof § 16700 et seq, (2)
21 California's Unfair Competition Law (UCL), Cal Bus & Prof § 17200
22 et seq, (3) Cal Labor Code § 2802, (4) Cal Labor Code § 450 and (5)
23 Cal Labor Code § 201.  See FAC 9-14, ¶¶ 33-64.  For these alleged
24 violations, the FAC sought declaratory relief, injunctive relief,
25 compensatory damages, treble damages (under the Cartwright Act),
26 punitive or exemplary damages and an award of attorney fees and
27 costs.  See id at 14-15, Prayer.
28 //

                                  2

United States District Court

For the Northern District of California

The FAC identified two putative classes on whose behalf plaintiff proposes to prosecute this action: (1) the main class, defined as "[a]ll persons who are and were employed by [d]efendants in the State of California and who were required to purchase Ralph Lauren clothing and accessories as a condition of their employment at any time" and (2) the Labor Code § 201 sub-class, defined as "[a]ll persons within [t]he [m]ain [c]lass who have participated in [d]efendants' [s]pecial [p]urchase [p]rogram [described below] (and any predecessor wage-withholding program)."  Id at 7, ¶ 26.

Plaintiff alleged that the dress code for employees working in retail sales for defendants, as implemented by managers at defendants' retail stores, constituted an unlawful uniform policy.  According to the FAC, defendants' retail employee handbook for 2002 required all sales staff of Polo Ralph Lauren retail stores to wear Polo Ralph Lauren merchandise while at work.  Id at 3, ¶ 8.  In furtherance of this policy, plaintiff alleged that managers employed by defendants subjected plaintiff and other members of the main class to "improper and demeaning inspections" and even "strip searches" to ensure compliance with the uniform policy.  Id at 3, ¶ 8, 4, ¶ 10.  Plaintiff alleged that defendants' employees were threatened with termination if they failed to dress as required.  Id at 4, ¶ 11.  The core allegation of the FAC is that members of the main class were required by their employer to purchase clothing manufactured by their employer on a seasonal basis.  As a practical matter, plaintiff alleged, this policy forced defendants' employees to buy high-priced clothing and accessories directly from defendants.

//

United States District Court
For the Northern District of California

In addition, plaintiff alleged that defendants' "PRC Special Purchase Program" violates state law. Id at 5, ¶ 16. Through this program, plaintiff alleges, "[d]efendants 'advance' Polo Ralph Lauren products to their employees * * * and then withhold wages from their employees to pay for the apparel and accessory purchases."  Id.  Although the program offered clothing to defendants' employees for purchase at a substantial discount, plaintiff alleged that "[t]he program is designed to create a captive, dependent, vulnerable and profitable customer base, i e, [d]efendants' sales associates, who must purchase Polo Ralph Lauren apparel and accessories as a condition of employment."  Id.

On March 18, 2003, defendants filed a notice of pendency of another action, informing the court that a class action alleging the same wrongful conduct had been filed in San Francisco County superior court under the name <u>Esteen, et al v Polo Ralph Lauren Corp, et al</u>, CGC-03-418019.  Doc #11.  On June 30, 2003, plaintiff moved to dismiss the FAC for lack of jurisdiction.  Doc #21.  The next day, defendants separately moved for (1) summary adjudication on plaintiff's claim under the Cartwright Act and contingent claims for unfair competition and declaratory relief and (2) judgment on the pleadings on plaintiff's remaining claims.  Docs ##12, 13, 16. On August 1, 2003, the court denied plaintiff's motion to dismiss. Doc #66.  On August 11, 2003, defendants moved for sanctions pursuant to FRCP 11, contending that plaintiff's counsel frivolously moved to dismiss the FAC.  Doc #74.  On August 18, 2003, the court granted defendants' motion for summary judgment (Doc #81 at 4-8) but denied defendants' motion for judgment on the pleadings on the remaining claims.  Id at 8-18.

4

United States District Court

For the Northern District of California

On October 27, 2003, the court granted defendants' motion for monetary sanctions, noting that plaintiff's motion to dismiss "was made in objective bad faith and was therefore frivolous" (Doc #100 at 25) and that "plaintiff has engaged in a pattern of serving harassing and vexatious motions and papers, apparently for the purpose of facilitating the litigation of the claim in state court, rather than federal court." Id at 28-29. Accordingly, the court concluded that "plaintiff's motion to dismiss violates both the frivolousness and improper purpose components of Rule 11" and "reserve[d] the question of the amount of sanctions until the conclusion of this case." Id at 29-30. The court observed, however, that "[i]t is possible that the inconvenience caused to defendants warrants sanctions in an amount more than the costs and fees associated with [plaintiff's motion to dismiss and defendants' motion for sanctions.]" Id at 30.

On January 12, 2006, plaintiff filed a motion for preliminary approval of settlement, Doc #114, and the parties stipulated to amend the FAC so that Roy Esteen, Raeshon Graham and Janika Goff would be added as named plaintiffs and RL Footwear and Fashions Outlet of America, Inc would be added as defendants. Doc #116. On January 31, 2006, the court granted the parties' stipulation. Doc #123.

On October 25, 2006, the court granted plaintiff's motion for provisional certification of the settlement class and confirmed Rosenthal & Company as the claims administrator, Patrick Kitchin, Daniel Feder and Freeborn & Peters as class counsel and Toni Young as class representative. Doc #149. The court also set a schedule for further proceedings. Id. Plaintiff filed a motion for final

1    approval of settlement on January 17, 2007.  Doc #150.

2

3                                    II

4            The court first takes up the issue of the fairness of the

5    settlement, which, in the aggregate, consists of $1 million in cash

6    and $500,000 in gift cards for Polo merchandise (which the court

7    estimated to have a resale value of $400,000).  In assessing

8    whether a settlement is "fair, reasonable and adequate" under FRCP

9    23(e)(1)(C), this court is to consider several factors:

10               (1) the strength of the plaintiffs' case; (2)
                 the risk, expense, complexity, and likely
11               duration of further litigation; (3) the risk of
                 maintaining class action status throughout the
12               trial; (4) the amount offered in settlement
                 [presumably in comparison to comparable cases];
13               (5) the extent of discovery completed and the
                 stage of the proceedings; (6) the experience
14               and views of counsel; (7) the presence of a
                 governmental participant; and (8) the reaction
15               of class members to the proposed settlement.

16
     Churchill Village v General Electric, 361 F3d 566, 575 (9th Cir
17
     2004) (citing Hanlon v Chrysler Corp, 150 F3d 1011, 1026 (9th Cir
18
     1998)).  To these factors, the court adds (9) the procedure by
19
     which the settlements were arrived at, see Manual for Complex
20
     Litigation (Fourth) § 21.6 (2004), and (10) the role taken by the
21
     plaintiff in that process.
22
             Factor (1) somewhat favors settlement:  although
23
     plaintiff appears to have a strong legal claim, several issues
24
     render the outcome uncertain.  For instance, Polo argued that, even
25
     if its policy violated the "uniform" laws of California, the
26
     overwhelming majority of purchases made by its employees of Polo
27
     merchandise were made on their own accord.  To support this
28

United States District Court
For the Northern District of California

contention, Polo demonstrated that employee purchasing levels *increased* after Polo discontinued its mandatory uniform requirement in December of 2002.  See Doc #147, Ex B.  Hence, plaintiff may have had trouble establishing causation with respect to the amount of damages in the case.  See <u>In re Veritas Software Corp Sec Litig</u>, 2005 US Dist LEXIS 30880 at *14-15 (ND Cal 2005) (challenges in proving damages and other litigation risks supported approval of settlement).  Additionally, by changing its policies in December 2002, Polo minimized potential damages and precluded plaintiff from obtaining injunctive relief.

Because this litigation has terminated before the commencement of trial preparation, factor (2) also militates in favor of the settlement.  The next step in this case would likely have been expert discovery and trial preparation.  Considerably more risk, to say nothing of effort and expense, would be entailed in taking these next steps.

Factor (3) weighs in favor of settlement because class treatment is generally appropriate in such litigation.

The amount of settlement consideration, which is addressed in factor (4), supports the settlement.  The court will not rescribe plaintiff's argument on this point, see Doc #150 at 9-12, but does note that the settlement here appears to represent an average to better-than-average recovery in comparison to like cases.  See Doc #136 at 3; Doc #137 at 4-5 (describing settlements in similar suits concerning wardrobe policy against The Gap, Banana Republic and Chico's Fas).  Moreover, Polo provided to plaintiff verified purchase history data in connection with the mediation in this case.  These data enable the court to compare the average

actual costs incurred by Polo employees to the projected settlement award, as depicted by the following two tables.

### Retail Store Cash and Gift Card Allocation

Cash:          $300,000
Gift Cards:    $375,000

| Time Worked (Weeks) | Total Value | Actual Damages (Mean) | Cash | Cash Value of Card |
|---|---|---|---|---|
| 1-26 | $888 | $344.40 | $440 | $448 |
| 26-52 | $1,332 | $689.80 | $660 | $672 |
| 52-104 | $1,776 | $1,034.20 | $880 | $896 |
| 104-156 | $2,220 | $2,064.40 | $1,100 | $1,120 |
| >156 | $2,664 | $2,759.20 | $1,320 | $1,134 |

### Factory Outlet Store Cash and Gift Card Allocation

Cash:          $100,000
Gift Cards:    $125,000

| Time Worked (Weeks) | Total Value | Actual Damages (Mean) | Cash | Cash Value of Card |
|---|---|---|---|---|
| 1-26 | $88.80 | $120.540 | $44.00 | $44.80 |
| 26-52 | $177.60 | $240.14 | $88.00 | $89.60 |
| 52-104 | $266.40 | $480.24 | $132.00 | $134.40 |
| 104-156 | $355.20 | $720.34 | $176.00 | $179.20 |
| >156 | $444.00 | $960.44 | $220.00 | $224.00 |

The primary downside of the proposed settlement is the use of product vouchers in the settlement award. The federal rules instruct that "[s]ettlements involving nonmonetary provisions for class members * * * deserve careful scrutiny to ensure that these provisions have actual value to the class." Advisory Committee note for FRCP 23(2)(C)(h). In its preliminary approval order, the

8

United States District Court
For the Northern District of California

court asked "why would former employees, who allegedly were forced to buy a great deal of unwanted Polo products, desire product vouchers so that they could purchase even more clothes?"  In response, plaintiff notes that Polo sells a broad array of merchandise other than clothes, such as sheets, towels, perfume and paint.  Doc #152, Ex 9.  More compelling than the availability of alternative items like Polo brand paint or perfume is the transferability of the gift cards; this enables class members to obtain cash — something all class members will find useful.

Within the confines of this litigation, factor (5) also supports settlement.  By the time the settlement was reached, the litigation had proceeded to a point in which both plaintiff and defendants "ha[d] a clear view of the strengths and weaknesses of their cases."  <u>In re Warner Communications Sec Litig</u>, 618 F Supp 735, 745 (SDNY 1985) aff'd 798 F2d 35 (2d Cir 1986).  At the time of the mediation, plaintiff had been litigating the action for more than four years and had conducted extensive informal investigation and discovery.  As a result, the true value of the class' claims was well known.

The views of counsel, factor (6), support settlement.  While some courts have indicated that such views are entitled to deference, see, e g, <u>Williams v Vukovich</u>, 720 F2d 909, 922-23 (6th Cir 1983), the court is reluctant to put much stock in counsel's pronouncements, given their obvious pecuniary interest in seeing the settlement approved.

Factor (7) does not support settlement, inasmuch as there is no government participant present.

//

United States District Court

For the Northern District of California

Factor (8) supports settlement because, as of yet, there have been no objectors to the settlement.  The response to the notice mailed to 5,112 potential class members on December 22, 2006, has been positive.  The claims administrator has not received any objections or requests for exclusion.  See Doc #152, ¶ 9.  See also In re Pain Webber Ltd Partnerships Litig, 171 FRD 104, 126 (SDNY), aff'd 117 F3d 721 (2d Cir 1997).

The court has previously discussed how factor (9) supports the settlement here.  See Doc #149.  The extended and difficult negotiations (with the assistance of an experienced mediator) culminated in a settlement that was reached in a procedurally sound manner.

Finally, factor (10) supports the settlement because lead plaintiff was intimately involved in the settlement negotiations, see Doc #142 (Young decl), ¶6.

For the reasons discussed above and in its October 25, 2006, order, the court finds that, on balance, the settlement is fair, reasonable and adequate to the class within the meaning of FRCP 23(e)(1)(C).  Accordingly, the court GRANTS the motion for final approval of the settlement and allocation plan.


                                III

Plaintiff seeks an award of attorney fees in the amount of $438,188.70 to be paid from the settlement fund, which represents 31% of the settlement amount (accounting for the actual cash value of the gift cards).  Compared to what has been described as "benchmark" percentage awards in this Circuit, a percentage of 31% is at the high end of the range.  As noted elsewhere, the court

United States District Court
For the Northern District of California

has serious reservations about the adequacy of such a comparison to test the reasonableness of a fee award. See generally Vaughn R Walker & Ben Horwich, <u>The Ethical Imperative of a Lodestar Cross-Check: Judicial Misgivings About "Reasonable Percentage" Fees in Common Fund Class Actions</u>, 18 Georgetown J Legal Ethics 1453 (2005).

Indeed, the court's independent research into fee award practice in other courts convinces it that the best practice is to assess a percentage fee award not only by using the usual litany of factors bearing on the reasonableness of a fee, see, e g, <u>Vizcaino v Microsoft Corp</u>, 290 F3d 1043, 1047-50 (9th Cir 2002), but also by cross-checking the percentage fee award against a rough fee computation under the lodestar method. See, e g, <u>In re GMC Pick-Up Tuck Fuel Tank Prods Liability Litig</u>, 55 F3d 768, 820-21 & n40 (3d Cir 1995) (Becker, J). See also <u>Vizcaino</u>, 290 F3d at 1050-51 (approving district court's use of a lodestar cross-check); <u>In re HPL Techs, Inc, Sec Litig</u>, 366 F Supp 2d 912 (ND Cal 2005).

In contrast to the use of the lodestar method as a primary tool for setting a fee award, the lodestar cross-check can be performed with a less exhaustive cataloging and review of counsel's hours. See <u>In re Rite Aid Corp Sec Litig</u>, 396 F3d 294, 306 (3d Cir 2005) ("The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting."); <u>Goldberger v Integrated Resources, Inc</u>, 209 F3d 43, 50 (2d Cir 2000) ("Of course, where [the lodestar method is] used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized."). All that should be required is sworn declarations from the attorney(s) in charge of billing records for

the case attesting to (1) the experience and qualifications of the attorneys who worked on the case; (2) those attorneys' customary billing rates during the pendency of the case; and (3) the hours reasonably expended (reduced if necessary in the exercise of professional billing judgment) by those attorneys in prosecuting the case.

Three figures are salient in a lodestar calculation: (1) counsel's reasonable hours, (2) counsel's reasonable hourly rate and (3) a multiplier thought to compensate for various factors (including unusual skill or experience of counsel, or the ex ante risk of nonrecovery in the litigation). In performing a lodestar cross-check, however, the multiplier is implied by the ratio of the proposed percentage fee to the computed lodestar fee. For example, for a proposed percentage fee of $250,000 and a corresponding lodestar fee of $100,000, the implied multiplier is 2.5. This implied multiplier may be assessed for reasonableness. Accordingly, the court need only consider counsel's reasonable hours and counsel's reasonable hourly rate in computing the lodestar.

For hourly rates, the court uses 2005 hourly rates; doing so simplifies the calculation and accounts for the time value of money in that counsel has not been paid contemporaneously with their work in this case. See Vizcaino v Microsoft Corp, 290 F3d 1043, 1051 (9th Cir 2002) (citing Gates v Deukmejian, 987 F2d 1392, 1406 (9th Cir 1992) ("Calculating fees at prevailing rates to compensate for delay in receipt of payment was within the district court's discretion."); Fischel v Equitable Life Assurance Society, 307 F3d 997 (9th Cir 2002) (citing In re Coordinated Pretrial

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  <u>Proceedings in Petroleum Products Antitrust Litigation</u>, 109 F3d
2  602, 609 (9th Cir 1997)) (district court has discretion to
3  compensate for delayed payment by either applying current rates or
4  applying historical rates with a prime rate enhancement).

5       The Fogel, Feder and Kitchin declarations provide line-
6  by-line billing reports of the hours expended by counsel in this
7  litigation.  Doc ##135, 136, 137.  Upon review of these reports,
8  the court concludes that counsel spent a reasonable number of hours
9  on this litigation.  One aspect is notable:  the bulk of the hours
10 expended (more than 80%) were devoted by experienced attorneys.
11 This captures the importance to this case of settlement
12 preparations and discussions.

13      The unusually large fraction of senior attorney time
14 devoted to settlement is also relevant to counsel's hourly rate.
15 Billing all attorney time at a "blended" hourly rate is probably
16 appropriate in most lodestar cross-check computations for two
17 reasons.  First, it simplifies calculations.  Second, it encourages
18 economically efficient allocation of work within class counsel's
19 firm.  But the central role of settlement negotiations in this
20 litigation -- and the central role of senior attorneys in those
21 negotiations -- suggest that typical blended hourly rates (perhaps
22 in the $200 per hour neighborhood) are inappropriate here.  Cf
23 <u>Allen v Bay Area Rapid Transit District</u>, 2003 WL 23333580 at *7 (ND
24 Cal) (concluding in a civil rights case on which two attorneys
25 worked that "the court has no basis for employing a reasonable
26 hourly billing rate in its lodestar calculation either greater or
27 lower than the approximate local average of $150 discernible from
28 publicly available data"); <u>Albion Pacific Property Resources, LLC v</u>

13

United States District Court
For the Northern District of California

Seligman, 329 F Supp 2d 1163, 1178 (ND Cal 2004) (holding, on a
successful motion to remand, "plaintiff is entitled to an
above-average hourly rate if it can demonstrate that its counsel
were more efficient than reasonably competent counsel would have
been" but that "[p]laintiff has made no such showing" and
accordingly awarding "a reasonable attorney fee at an hourly rate
of $190/hr for attorneys"); Yahoo!, Inc v Net Games, Inc, 329 F
Supp 2d 1179, 1185, 1188 (ND Cal 2004) (explaining that "the
average market rate in the local legal community as a whole is a
better approximation of the hourly rate that would be charged by
reasonably competent counsel than the actual billing rate charged
by a single attorney" and that "[f]ocusing on the requested number
of hours as a whole rather than the requested hourly rates of
individual attorneys produces better attorney fee decisions").

        The court understands that such blended rates typically
depend on the overall billing mix including substantial time
expended in discovery by junior attorneys with relatively low
billings rates.  Here, a large fraction of overall time was spent —
and necessarily so, it seems — by senior attorneys in settlement
discussions and preparation.  Accordingly, the court concludes that
use of a blended hourly rate is a poor fit for this case.

        It is the practice of the undersigned judge to rely on
official data to determine appropriate hourly rates.  One reliable
official source for rates that vary by experience levels is the
Laffey matrix used in the District of Columbia. See http://www.us
doj.gov/usao/dc/Divisions/Civil Division/Laffey Matrix 4.html
(citing Laffey v Northwest Airlines, Inc, 572 F Supp 354 (D DC
1983), aff'd in part, rev'd in part on other grounds, 746 F2d 4 (DC

14

1  Cir 1984)).

2          Under the 2005 <u>Laffey</u> matrix, attorneys with 20 or more

3  years of experience bill $390/hour; attorneys with 11-19 years of

4  experience bill $345/hour; attorneys with 8-10 years of experience

5  bill $280/hour; attorneys with 4-7 years of experience bill

6  $225/hour; attorneys with 3 or fewer years of experience bill

7  $185/hour; and paralegals bill $110/hour.  These figures are,

8  however, tailored for the District of Columbia, which has a

9  somewhat lower cost of living than the San Francisco Bay area (in

10  which two of plaintiff's firms operate); the court will adjust

11  these figures accordingly.  The locality pay differentials within

12  the federal courts -- which, like law firms, employ lawyers and

13  legal support staff -- approximates this difference.  See

14  http://jnet.ao.dcn/Human_Resources/Pay_Tables/2005_Pay_Tables/

15  Judiciary_Salary_Plan_Pay_Tables_2005.html.  The Washington-

16  Baltimore area has a +15.98% locality pay differential; the San

17  Francisco-Oakland-San Jose area has a +26.39% locality pay

18  differential.  Thus, adjusting the <u>Laffey</u> matrix figures upward by

19  approximately 9% will yield rates appropriate for the Bay area.[1]

20          Applying this adjustment and rounding, the court obtains

21  the following rates:  Attorneys with 20 or more years of experience

22  bill $425/hour; attorneys with 11-19 years of experience bill

23  $376/hour; attorneys with 8-10 years of experience bill $305/hour;

24  attorneys with 4-7 years of experience bill $245/hour; attorneys

25  with 3 or fewer years of experience bill $200/hour; and paralegals

26  bill $120/hour.  Reproducing the table above, but substituting

27

28

          [1](126.39 - 115.98) / 115.98 = 0.08976, or about 9%.

these values and recomputing the totals yields:

| Attorney | Experience | 2005 Billing Rate (per hr) | Total Hours | Total lodestar |
|---|---|---|---|---|
| Kitchin | 14 years | $376 | 850.00 | $319,600.00 |
| Feder | 20 years | $425 | 530.00 | $225,250.00 |
| Fogel | 21 years | $425 | 173.20 | $73,610.00 |
| Albritton | 12 years | $376 | 2.90 | $1,090.40 |
| Atteberry | 3 years | $200 | 12.10 | $2,420.00 |
| Benjamin | paralegal | $120 | .90 | $108.00 |
| Foster | 8 years | $360 | 67.00 | $24,120.00 |
| Gandhi | 3 years | $200 | 4.40 | $880.00 |
| Helton | 6 years | $245 | 165.00 | $40,425.00 |
| Hwong | accountant | $120 | 41.00 | $4,920.00 |
| Holt | 1 year | $200 | 28.70 | $5,740.00 |
| Kirkpatrick | paralegal | $120 | 59.70 | $7,164.00 |
| Kramer | 3 years | $200 | 11.50 | $2,300.00 |
| Levy | 17 years | $376 | 168.00 | $63,168.00 |
| Wise | paralegal | $120 | .40 | $48.00 |
| | | Totals | 2130.80 | $770,843.40 |

The court now turns to the lodestar cross-check, which entails evaluation of the multiplier implied by counsel's requested fee (31% percent of a $1.4 million settlement, or $434,188.70) and counsel's lodestar fee (computed above as $770,843.40). These data imply a multiplier of 0.56. This so-called negative multiplier suggests that, despite exceeding the 25% benchmark used by some courts, the fees sought here are reasonable based on the time and effort expended by plaintiff's counsel. This outcome also shows that relying on percentages without reference to these other factors can be, like blind reliance on benchmarks, an "all too

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

tempting substitute for the searching assessment that should properly be performed." Goldberger, 209 F3d at 52. Here, a lodestar cross-check supports the fee sought by counsel.

One issue concerning the settlement amount remains: the discrepancy between the total settlement and the amount actually claimed by the class. On February 2, 2007, the court ordered plaintiff's counsel to submit a memorandum describing "(1) the number and percentage of class members who have submitted claim forms and (2) the total payout those class members will receive." Doc #158. In response, plaintiff's counsel stated that 949 claims have been filed by class members, representing 18.6% of the class. Doc #159, ¶ 12. Based on the settlement agreement, the total dollar value of these claims is $459,000 or approximately 48% of the total settlement fund. Id, ¶ 14.

The fact that the class will recover about half of the total settlement gives the court pause. The Ninth Circuit, however, bars consideration of the class's actual recovery in assessing the fee award, drawing on an expansive reading of Boeing Co v Van Gemert, 444 US 472 (1980). See Williams v MGM-Pathe Communications Co, 129 F3d 1026 (ruling that a district court abused its discretion in basing attorney fee award on actual distribution to class). But see Strong v BellSouth Telecomms, Inc, 137 F3d 844, 852 (5th Cir 1998) (finding no abuse of discretion where district court based fee award on actual payout rather than total fund). It is worth noting that the Supreme Court appears to be poised to revisit Boeing. See International Precious Metals Corp v Waters, 530 US 1223 (2000) (O'Connor, J) (denying writ of certiorari but noting that fund settlements that allow attorney

17

**United States District Court**
For the Northern District of California

fees to be based upon the total fund may "potentially undermine the underlying purposes of class actions by providing defendants with a powerful means to enticing class counsel to settle lawsuits in a manner detrimental to the class" and, in turn, "could encourage the filing of needless lawsuits"). Although the court shares Justice O'Connor's concerns, it follows Ninth Circuit case law and declines to reduce the award of attorney fees based on the actual distribution to class. Accordingly, the court awards plaintiff's counsel expenses of $65,811.30 and fees of $438,188.70.

IV

Finally, of course, remains the issue of sanctions, which the court granted on October 27, 2003. Doc #100. In its order, the court concluded that plaintiff's motion to dismiss "was made in objective bad faith and was therefore frivolous" (Doc #100 at 25) and that "plaintiff has engaged in a pattern of serving harassing and vexatious motions and papers, apparently for the purpose of facilitating the litigation of the claim in state court, rather than federal court." Id at 28-29. Accordingly, the court determined that "plaintiff's motion to dismiss violates both the frivolousness and improper purpose components of Rule 11" and "reserve[d] the question of the amount of sanctions until the conclusion of this case." Id at 29-30.

After the court entered its October 27, 2003, order, the parties entered into a settlement agreement. As part of the settlement, defendants agreed to waive the claim of sanctions against plaintiff and her counsel. Doc #115, ¶ 6(b). This agreement does not, however, let plaintiff's counsel off the hook.

United States District Court

For the Northern District of California

Monetary sanctions under Rule 11 aim to deter rather than compensate.  Hence, permitting parties to contract around the court's issuance of sanctions would blunt the rule's deterring force.

Turning to the question of the amount that should be awarded, the court's order provided the following guidance:

> The court * * * reserves the question of the amount
> of sanctions until the conclusion of this case.
> Although the court herein decides that sanctions of
> some amount are indeed warranted, it nevertheless
> finds that the exact amount of those sanctions
> should not be determined until more is known about
> the long-term impact of plaintiff's unwarranted
> filings on the case.  It is possible that the
> inconvenience caused to defendants warrants
> sanctions in an amount more than the costs and fees
> associated with the two motions.  It is also
> possible that the impact of the improper filing on
> the further proceedings in the case will be
> minimal.  In any event, the question is best
> evaluated at the close of the case, and the court
> hereby RESERVES the question until then.

Doc #100 at 30.

Rule 11 deters by forcing counsel to bear the social costs of their actions.  Here, those costs include expenses needlessly incurred by defendants in litigating plaintiff's frivolous motion; the court will fashion a sanction on this basis. The court does not suggest, however, that unnecessary legal fees are the only social consequences of carelessly invoking the judicial process.

With the benefit of defendants' submissions, the court turns to quantifying the burden that was unjustifiably imposed upon defendants by the filing of frivolous motion.  Defendants seek compensation for 27.2 hours of attorney time in connection with plaintiff's motion, including researching, drafting and revising

19

United States District Court
For the Northern District of California

defendants' opposition to plaintiff's motion.  Doc #76 (Miller decl), ¶ 2; Doc #77 (Frazier decl), ¶ 7.  Defendants also seek compensation for 10.5 attorney hours in preparing their motion for sanctions and its accompanying declarations.  Id.  The court finds the claimed time reasonable.  Defendants' counsel's work product was at least of the quality of a reasonably skilled attorney, and the number of hours expended are reasonable in light of the fairly simple -- but not utterly trivial -- nature of the papers that defendants needed to file.

The court further finds the claimed rates of $325/hour for Mr Miller and $240/hour for Mr Frazier reasonable because they comport with adjusted rates from the Laffey matrix set forth above.  In particular, the rate for Miller (with 22 years of experience) is lower than the Laffey amount and Frazier's rate is equal to the amount projected for a mid-level associate.  Accordingly, the court determines that the requested amount, $11,011.50, is a reasonable sanction for plaintiff's frivolous motion.  Given the unitary nature of counsel's conduct in this case, they are jointly and severally liable for the full amount of the Rule 11 sanctions.  Kona Enterprises, Inc v Estate of Bishop, 229 F3d 877, 888-89 (9th Cir 2000); see also Pekarsky v Ariyoshi, 575 F Supp 673, 676-77 (D Hawaii 1983) (Schwarzer, J).  Finally, the court determines that the award of sanctions should be paid to defendants, as plaintiff's frivolous motion caused "needless increase in the cost of litigation."  See FRCP 11(b)(1); See also 11(c)(1)(A) ("If warranted, the court may award to the party prevailing on the motion the reasonable expenses and attorney[] fees incurred")
//

20

**United States District Court**
For the Northern District of California

V

The court GRANTS the motion for final approval of the settlements and plan of allocation.  Doc ##135, 146.  The court also GRANTS plaintiff's motion for an award of attorney fees and costs.  Out of the settlement fund, the court awards plaintiff's counsel expenses of $65,811.30 and fees of $438,188.70.  Additionally, pursuant to Rule 11, plaintiff's counsel are ORDERED to pay sanctions in the amount of $11,011.50 to defendants on or before May 1, 2007.  The clerk is DIRECTED to close the files and terminate all motions.

IT IS SO ORDERED.

VAUGHN R WALKER
United States District Chief Judge